By the Court.
Mason, J.
The controversy in this suit has arisen under the act of the legislature passed May 25th, 1836, (Laws 1836, ch. 484, p. 739,) which authorized the persons therein named, their heirs and assessors, to erect wharves, docks, &c., in front of their lands in the city of Brooklyn,.not, however, beyond a permanent lin¿ established by the act. And the question presented for our decision -is, in what direction the boundary line between the plaintiffs on the one side, and the defendant on the other, is to be drawn from the shore to the exterior or permanent line. If the line of the shore, at high-water mark, were straight, and the lands contemplated in the act were of the same length with, and parallel -to, the permanent line, it -would 'be a very simple matter'; each owner would draw aline from the extreme ends of his upland, and at right angles to the same, to the penmanent line,- and the intermediate space- -would clearly be the portion in front of his land to which he would be entitled. But as the shore is-crooked, and has -numerous projections and in *207 dentations, while the exterior or permanent line is straight, the settlement of the boundaries of the yvater lots,'and the designation of the- front, on the exterior line belonging to each, are attended with.noÉ little difficulty. ' The principle; however, which should govern is very apparent, and that is, to draw the lines in such a manner as to give to each riparian proprietor a water front proportioned in extent to his shore line. ■ And the' rule adopted by the supreme court of Massachussets, in Deerfield v. Arms, (17 Pick. 45,) is at once simple and just. It is as follows ; l.5 “ To measure the whole extent of the bank or line of the river, (or such part as is opposite to the newly formed line,) and compute how many rods, yards, or feet, each riparian proprietor owns on the river line.” In applying this rule, however, the general line ought to be taken, and not the actual length of the line, if it happens-to be elongated by deep indentations or sharp projections; but the actual line should be reduced, by an. equitable and judicious estimate, to the general available line of the land upon the river. 2. “ Next, supposing the former line, for instance, .to amount to 200 rods, to divide the newly formed, bank or line into 200 equal parts, and appropriate to each proprietor as many portions of this newly formed bank as he owned rods on the old. Then, to complete the division, lines are to be drawn from the points at which; the proprietors respectively bounded on the old, to-the points thus determined as the points of division on the newly formed shore. The division lines thus drawn, it is obvious, will be either parallel or divergent or convergent, as the new shore line of the river equals or exceeds or falls short of the old.” In other words, the number of feet or. rods on the newly formed line .to which each proprietor will be entitled, will bear the same proportion to the number of feet he owns on the old.line, that the whole-length of the new linehears to the whole length of the old.
The case of Deerfield v. Arms was one of land newly formed by alluvial deposits, on the margin and bed of Deerfield- river. But the .principle, is .capable of application to a-case like the one before us. Thus, if we assume the whole length of the shore line, opposite to the exterior or permanent line created by *208 the legislature, to be, as indicated by Exhibit No. 14,13,650 feet, and the whole length of the permanent line to be 11,645 feet, and the length of the shore line belonging to the plaintiffs, from its northern extremity to the middle of Harrison-street, to be 133 feet, then 13,650 : 11,645 :: 133:113', or the number of feet on the permanent line to which the plaintiffs would, on these data, be entitled.
This calculation would not give to the plaintiffs the length on the permanent line claimed in their bill; but, as in the given length of the shore line all the indentations and projections are included, it comprises a greater number of feet than it ought, according to the rule laid down by the court in Deerfield v. Arms. And were this shore line reduced to the general line or course of the shore, rejecting the indentations and projections, the result of a calculation on that basis would not vary much from the number of feet actually claimed by the plaintiffs.
The rule laid down in Deerfield v. Arms, however,* cannot be applied in this suit, because we are not called upon to settle boundaries between the proprietors on the whole line, but only the boundary between two coterminous proprietors, and the course and direction of their boundary cannot be determined by the rule there adopted, without disturbing boundary lines already settled, unless they have all been fixed on the same principle, (as to which no evidence has been given in this cause.) Besides, we have not sufficient facts before us to enable us to say, whether, on the principles of that case, , the boundary sought to be settled should be drawn from the termini of the plaintiffs’ shore line, at right angles to the shore, or how otherwise.
Another mode was adopted by the supreme court of Maine, in Emerson v. Taylor. (9 Greenleaf, 44.) That was a case of settling the boundaries among coterminous proprietors, of the lands between high and low-water mark. The rule there laid down was as follows: ,
Draw a base line from the two corners of each lot where they strike the shore, and from those two corners extend parallel lines to low-water mark at right angles to the base line; if the line of the shore be straight, there will be no interference in *209 running the parallel lines. If the flats (or lands between high and low-water mark) lie in a cove of a regular or irregular curvature, there will be an interference in running such lines, and the loss occasioned by it must be equally borne, or gain enjoyed equally by the contiguous owners. The lines drawn according to this are, we apprehend, the lines described by the defendant, evinced as dividing the angle of indentation, and which, he contended, were the only proper boundary lines between coterminous proprietors in cases of this sort. It is to be observed that, in the case of Emerson v. Taylor, the question was as to the division of the land between high and low-water mark. So that the proprietors, each of them, have very nearly the same quantity of land, and in, the same curved shape, at low-water which they had on the shore. But the division, according to this rule, is not precisely accurate, since some of the division lines converge, and others diverge, though perhaps it would be fair enough in the great majority of such cases. Here, however, the course of the shore is crooked, and the outer line is straight, so that the boundary lines formed by dividing the angle of indentation would, if drawn out to the straight exterior line, have a ■very unequal operation; some of the riparian proprietors would have a greater length on the exterior than they have on the shore, and some would be shut out from it altogether. The effect of this may be clearly seen by a diagram.
Take, for example, diagram No. 2, as found in Emerson v. Taylor, [see (a), following page,] and draw, at some distance beyond low-water mark, a straight line, like the exterior line in the present case, and then extfend the lines which divide the angle of indentation to this exterior line, and it leads to inextricable confusion. Clearly, then, this rule cannot be a correct one.
There is still another mode, which appears better suited to the present case. The exterior or permanent line, as fixed by the legislature, is a straight line, and runs parallel to the general course of the shore. If, then, a base line be drawn parallel to this exterior line, and lines be drawn from the ends of the land of each proprietor, where it touches the shore, to the exterior line, and at right angles to the base line, the land included be *210 tween these spaces, and that portion of the exterior line embraced by them, would designate.the portion of each proprietor. And *211 if such line should also be in accordance with the general plan’ of the city, so much the better. ■ Upon this plan, a proprietor on whose land there should happen to be sharp projections and deep indentations, would not have an exterior front in proportion to the whole length of his portion of the shore line; but he and all his co-proprietors would have a front in proportion to the average length of the shore. And such a settlement of the boundaries would be, in an eminent degree,’ fair and liberal.
The question then recursWhat rule is to be adopted in the settlement of the boundary line between these parties ? or is that settlement to be governed in this case by any abstract rule ?
We agree entirely with the counsel for the defendant, that the grant by the legislature was not a grant to all of the shore proprietors jointly, but to each of them in severalty of the land under water in front of their own shore. But we cannot admit that the boundary between coterminous owners is so fixed by law, in this case, that the court is compelled to declare it as to each individual proprietor without reference to any other proprietor. On the contrary, it appears to us, that in order to determine where the law would fix the boundaries between any two coterminous proprietors, we must take into consideration the whole of the old shore line and the whole of the new line, and that the boundaries are to be so adjusted as to give to each his due proportion of water front. But We cannot so adjust the boundaries in the present case, because all the parties are not before us, and perhaps we ought not to attempt it if they were, because the proprietors have themselves adjusted their boundary lines for almost the whole distance. But as the case is now presented, it would be manifestly improper for us to disregard these adjustments, and to adopt a boundary between the parties to this suit which would disturb these adjustments, if their rights can be protected without it. If the other proprietors have adjusted their boundaries so as to suit their own interest without regard to the rights of the defendant and his associates, and have shut them out from their due proportion of land on the permanent line, such settlement and location cannot stand, and would be set aside in favor of the defendant on a proper bill or *212 complaint to which all such proprietors would be parties. But if the defendant and his associates have the full quantity of front to which they are entitled, they cannot on the other hand be allowed wantonly to disturb those settlements, .for the sake of establishing a boundary based upon some abstract rule.
It must be borne in mind that the claim set up by'the defendant is not on his individual account, but on behalf of all his associates in the purchase from the heirs of Cornell. He has not, individually, any claim as a riparian proprietor, and the whole land purchased by him and his associates must be considered, for the purposes of this question, as forming one property. Now it is in evidence in this case that the owners of the land south of that which belonged to the defendant and his associates, seven in number, agreed to take on the exterior or permanent line according to the number of feet which they owned respectively, along the original high-water mark, in doing which they acted on the principle .laid down in D.eerfidd v. Arms;, and that the deeds which they executed were drawn so as to conform to this arrangement. It is also in evidence that Messrs. "Wood and Havemeyer and Johnson, and with one, exception all the other owners on the north of the defendant’s purchase, have settled their boundaries in like manner, so as to conform to the streets. It further appears that the defendant and his associates caused their property, including .the water lots up to the permanent line, to be surveyed and laid out into lots .on a map, which they filed in the clerk’s office, and on such map ran their northern boundary line through the centre of Harrison-street to the exterior line. And it is moreover worthy of remark, that they distinctly note on the map itself, with regard to. the southern boundary of their water lots, that that line was not established below high-water mark, but record no such observation with respect to the northern boundary; .thus leaving.it to be inferred, by every one who saw.the jnap, that as. far as they were concerned they considered the northern boundary as fixed.. This map bears date in 1838, and since that time, and as late as 1846, the defendant Kelsey filled up his land to the centre of Harrison-street, but not beyond that line.
*213 . Now it is undoubtedly true, that if tbe law clearly gives to him and bis associates tbe boundary wbicb is claimed for them, they have not done any thing wbicb estops them from claiming it. We entirely assent to tbe doctrine advanced by tbe late chancellor in Adams v. Rockwell, (16 Wend. 302,) that where there can be no real doubt as to bow tbe premises should be located according to certain and known boundaries described in tbe deed, to establish a practical location different therefrom wbicb shall deprive tbe party of bis legal rights, there must be either a location wbicb has been acquiesced in for a sufficient length of time to bar a right of entry under the statute of limitations, or tbe erroneous line must have been agreed on between tbe parties claiming tbe land on both sides, or the party whose right is to be thus barred must have silently looked on and seen tbe other party subjecting himself to expenses wbicb be would not have done if the line bad not been so located. And we are also ready to admit that this doctrine would be applicable to tbe present case, if there' were one invariable mode of drawing tbe line between coterminous proprietors of water lots, rendering, upon a grant of tbe land under water in front of their upland, tbe boundaries between them as fixed and certain as if they bad been given by metes and distances in tbe grant itself. But such is not tbe fact. Tbe settlement of tbe actual boundary between coterminous proprietors in such cases is, as we have seen, a question of much difficulty ; and a mode of division, wbicb under some circumstances would be perfectly fair and equitable, would, under other circumstances, be directly tbe reverse. In this point of view, the practical location by tbe proprietors themselves of their respective boundaries is entitled to great weight, for it cannot be supposed that they will generally agree upon a principle of division wbicb would be unfair or unjust to any of them; and a mode of division generally adopted, no single individual of them ought to be allowed causelessly to distrust. Now here the proprietors generally have settled their boundaries so as to make them conform to tbe directions of tbe streets — a mode wbicb manifestly has in this present instance very great advantages over - any *214 other. The defendant, however, insists on a different mode of adjusting the boundary between him-and the plaintiffs — one which is entirely regardless of the lines of the streets, and which would produce great inconvenience and confusion. And what reason is adduced for claiming this new line ? It was not pretended that he and his associates had not received the whole water front to which they are justly entitled, nor has any evidence been given on that head. But the sole ground on which their claim to disturb even their own location is founded is, that by the established principles of law the boundary line between coterminous proprietors on a curved shore should equally divide the angle of indentation. We do not so understand it. On the contrary, we think we have shown that such a rule is incapable of application, where the shore is curved and the outer line is straight, as in the case before us. We apprehend the law gives no fixed and certain mode of drawing the boundary line, but only lays down a general principle which shall govern in such cases, which is, that each riparian proprietor shall receive his ratable share of front on the outer or water line, and that the boundary lines between coterminous proprietors are to be drawn at right angles, or divergent or convergent to the shore, according to circumstances. We are bound to presume, in the absence of all proof to the contrary, that the defendant and his associates took their full share of front when they made their map and bounded themselves by the centre of Harrison-street; and as this is a convenient, and on many accounts a desirable boundary, and the defendants have given no sufficient reason for going beyond it, we think it neither wise nor expedient to alter it. The necessary effect of this would be to throw these plaintiffs further north, break up the adjustment between Wood and Havemeyer and Johnson, and involve all these parties in a new litigation. .The defendant has not made out a case which would justify us in doing this, or in allowing him to go beyond the line, which he and his associates, years ago, fixed as the northern boundary of their water lots.
For these reasons, the report of the commissioner was right, and the exceptions to it are overruled with costs. There must *215 be a decree for tbe plaintiffs, pursuant to tbe prayer of tbeir bill, except as to tbe claim for damages.

 Diagram,—showing the operation of the rule in 9 Greenleaf, Emerson v. Taylor, referred to on the previous page.

The dotted lines are drawn at right angles to the base lines.
The lines between the dotted lines are intended to divide the angles formed by the base lines equally, and are the lines of division.
The line ab is the exterior line.